## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JULIE BEBERMAN,

                        *Plaintiff*,

        v.

MARCO RUBIO, *in his official capacity as Secretary of State*,

                        *Defendant*.

Civil Action No. 22-3434 (TJK)

## MEMORANDUM OPINION

Julie Beberman is a former State Department employee who allegedly violated the Visa Lookout Accountability Act by improperly issuing visas. Because of those transgressions, Beberman's supervisor revoked her access to the consular systems and documented the incident in her employee evaluation report. Concerns about these performance problems, moreover, contributed to Beberman's inability to obtain tenure at the end of her limited career appointment with the Department. Beberman sought administrative review of her performance evaluations from that period. And when the Department denied her relief, she sued to challenge those decisions. The parties cross-move for summary judgment. For the reasons explained below, the Court will grant summary judgment in part for the Department and in part for Beberman, and remand to the Foreign Service Grievance Board so that it may resolve one issue it failed to address.

I.    **Background**

    A.    **Legal Background**

The Visa Lookout Accountability ("VLA") Law regulates how consular officers adjudicate visas. Before issuing a visa, those officers must "certify, in writing, that a check of the Automated Visa Lookout System, or any other system or list which maintains information about the

excludability of aliens under the Immigration and Nationality Act, has been made and that there is no basis under such system for the exclusion of such alien." Foreign Relations Authorization Act ("FRAA"), Fiscal Years 1994 and 1995, Pub. L. 103-236, § 140(c)(1)(A) (codified at 8 U.S.C. § 1182 note). The Foreign Affairs Manual ("the Manual") offers guidance for consular officers to comply with that requirement. During the relevant time, the Manual instructed that "whenever you issue a visa, you must certify that a lookout check has been made and there is no basis for exclusion." 9 FAM App. G, 101.1-1(a) (effective from Sept. 7, 2011 to Oct. 10, 2012).[1] And officers "must properly resolve all hits in" various databases "and document [their] actions . . . before [they] issue a visa." *Id.* To "[e]stablish[] that there is 'no basis for exclusion,'" officers "must explain [their] reasons for issuing over a hit in the system either by demonstrating that the person named in the hit is not the same person as the applicant, or that the basis for the hit is not grounds for an ineligibility." *Id.* 101.1-1(b). Still, consular officers must "carefully consider[]" non-exact matches that are "close hits" "[u]nless there are obvious differences." *Id.* 101.1-1(c). The officers' performance evaluations must, by statute, note any violations of the VLA Law as a "serious negative factor." Pub. L. 103-236, § 140(c)(1)(B).

## B.    Factual Background

The State Department hired Beberman as an untenured Foreign Service career candidate in 2010 before she converted to a generalist track in 2011. ECF No. 34-1 ¶¶ 4–5. Untenured employees like her receive a limited career appointment of five years, after which the Department either offers tenure or separates the candidate from the Foreign Service. *See* 3 FAM 2216.2-1(c), 2245.1; 22 U.S.C. § 3949(a). Three tenure boards considered Beberman for tenure by reviewing

---

[1] Citations to Appendix G of the Foreign Affairs Manual refer to the version in effect in 2011 and 2012. *See* ECF No. 40-9 (then-effective Appendix G).

her official employee file, with the first board identifying several "problem areas" and "concerns voiced by her supervisors." ECF No. 34-1 ¶¶ 63–66. After that board and the second deferred her candidacy, the third denied her tenure. *See id.*

Caracas was Beberman's first assignment as a generalist career candidate. ECF No. 34-1 ¶ 6. There, she was responsible for adjudicating nonimmigrant visa applications, among other things. *Id.* Her first performance evaluation—reflecting work from the first half of 2012—was generally positive. AR 283–88.[2] Although her supervisor explained that she was "not, at this time, ready for tenure" because she "initially struggled" in "the efficient and judicious adjudication of [nonimmigrant visas]," she was "closing in on the average." ECF No. 34-1 ¶¶ 8–13. Beberman's second-level supervisor concurred. *Id.* ¶ 14.

Things deteriorated in the second half of 2012. Beberman's performance evaluation for July through November 2012 noted, as documented by her rater, that she had issued a visa to an applicant despite a direct match in the visa lookout system to a non-citizen who had been in the United States unlawfully for at least a year (and thus was subject to a ten-year bar for reentry under 22 U.S.C. § 1182) as well as a match to an FBI fingerprint record. ECF No. 34-1 ¶ 35; AR 21. That rater and another officer held a counseling session with Beberman about the incident "explain[ing] [their] concerns regarding the case at hand," but Beberman responded "that she had determined that the applicant had not been in the United States unlawfully and that she was correct in issuing the visa." AR 21. Beberman took this view, the rater documented, even though "the electronic case file" contained "no explanation" for "how she would have made such a determination"—and, "in any case," "such a determination . . . directly contradicts the clear [Department of

---

[2] For clarity, citations to parts one through four of the Administrative Record, ECF Nos. 45–48, are denoted "AR," while those to parts five through seven, ECF Nos. 49–51, are denoted by "2 AR."

Homeland Security] annotation." *Id.* The rater also noted that "Beberman's nonimmigrant visa refusal rate was 3.1 percent," much lower than the overall refusal rate of almost 15 percent for officers during that period and "less than one-third that of the officer with the next-lowest refusal rate." *Id.* That "extremely low" rate, coupled with Beberman's "apparent lack of concern over the potential [VLA] case during the counseling session," led the rater and other officer "to look more deeply into Ms. Beberman's visa issuances." *Id.* After finding what the rater considered to be other concerning issuances, he disabled Beberman's access to the consular systems—the "only time in [his] career that [he] ha[s] taken such a step"—and potential VLA violations were noted in Beberman's November Employee Evaluation Report. *Id.*; ECF No. 34-1 ¶¶ 39–42. Her review period ended early, in November 2012. *See* AR 26; ECF No. 34-1 ¶ 41.

In October 2012, the Department's Bureau of Consular Affairs informed Beberman that it had identified six potential VLA violations. ECF No. 34-1 ¶ 44; AR 360, 364. After reviewing more information from Beberman defending those visa decisions, Consular Affairs submitted four potential violations to the VLA Panel. ECF No. 34-1 ¶¶ 45–47; *see* 9 FAM App. G, 101.5(b)–(c). About a month later, that panel found that Beberman—in all four cases—had overridden an exact or "close phonetic" name or date-of-birth match in the visa lookout system without following appropriate procedures. ECF No. 34-1 ¶¶ 49–52; AR 396–99. These four VLA violations were also noted in her November evaluation. AR 21. Beberman appealed to the Managing Director of the Visa Office, who determined that the violations had occurred and that disciplinary actions could ensue. ECF No. 34-1 ¶¶ 53–54; AR 407. In June 2013, the Department proposed to suspend Beberman for two days. ECF No. 34-1 ¶ 55; AR 414–20. Beberman challenged that proposal with some success; in early 2014, the Department sustained the four VLA violations but shortened the proposed suspension to just one day. ECF No. 34-1 ¶¶ 56–58.

Although the Department denied Beberman tenure in 2016—and slated her for separation in March of that year–that separation did not happen immediately.  Instead, she remained with the Department on an interim basis for almost four more years while she challenged her tenure denial in other grievances not at issue here.  ECF No. 34-1 ¶¶ 67–71.  Eventually, though, Beberman was involuntarily retired in October 2019 when the Foreign Service Grievance Board denied the last of her outstanding motions for interim relief.  *Id.* ¶ 71.[3]

### C.    Procedural Background

Beberman filed three grievances with the Department that form the basis of this lawsuit. First, in February 2014, Beberman challenged her one-day suspension and various statements that her supervisors made in her November 2012 performance evaluation.  ECF No. 34-1 ¶ 73.  She sought and was granted interim relief from that suspension and left the Department many years later before ever serving it.  *See id.* ¶ 79.  In October 2014, Beberman filed a second grievance challenging certain statements in her July 2012 performance evaluation.  *Id.* ¶ 74.  And finally, in April 2015, Beberman challenged the tenure boards' decisions to defer her tenure based on the July and November 2012 performance evaluations.  *Id.* ¶ 75.

These three grievances were ultimately consolidated before the Department.  ECF No. 34-1. ¶ 78.  The Department denied all three, and Beberman appealed to the Grievance Board.  *Id.*

---

[3] Beberman has filed a slew of other lawsuits stemming from her employment with the State Department.  *E.g.*, *Beberman v. Kerry*, 16-cv-2361 (D.D.C.); *Beberman v. Blinken*, 21-cv-3082 (D.D.C.); *Beberman v. Blinken*, 22-cv-144 (D.D.C.).  She moved to strike mention of those other cases from the Department's cross-motion.  ECF No. 30.  The Court will deny that motion, as it did before in resolving a similar motion filed in another of Beberman's cases.  *See Beberman v. Blinken*, No. 22-cv-144 (TJK), 2024 WL 551666, at *1 n.1 (D.D.C. Feb. 12, 2024).  References to these cases, of which the Court is aware, do not come close to the kind of material that is properly the subject of a motion to strike: "allegations that unnecessarily reflect on the moral character of an individual or state anything in repulsive language that detracts from the dignity of the court." *Cobell v. Norton*, 224 F.R.D. 266, 282 (D.D.C. 2004) (cleaned up), *reconsideration denied*, 355 F. Supp. 2d 531 (D.D.C. 2005).

¶¶ 76–77.  In June 2017, the Board denied her request for interim relief, but as noted above, Beberman remained employed at the Department while the Board resolved her requests for interim relief in connection with her other grievances.  AR 1497.

In March 2021, the Board held that it lacked jurisdiction to determine the validity of the four VLA violations that the Department had found.  AR 1864.  The Board also dismissed as moot Beberman's challenges to (1) the one-day suspension, because the Department had rescinded the suspension after Beberman left the Department in 2019, *id.*, and (2) the findings of the tenure boards that had deferred her application for tenure, because the Board had ordered—in connection with one of Beberman's other grievances—that reconstituted tenure boards consider her application anew given procedural problems with the original boards, AR 1866–67.  The latter conclusion has not been challenged, so the tenure boards' decisions are no longer at issue.

In September 2021, in what it termed an "interim decision," the Board reevaluated the jurisdictional issue relating to the VLA violations.  The Board found that it *did* have jurisdiction to address their validity because they were made part of Beberman's November 2012 performance evaluation.  AR 3920, 3934–35.  Accordingly, it reopened discovery on that issue.  AR 3920.  The Board also redacted, sua sponte, several statements from Beberman's November 2012 employee evaluation as unnecessarily repetitive.  AR 3907–09.  But the Board denied the bulk of Beberman's claims.  Specifically, it found that Beberman's argument that she had an "alleged procedural right to an unsatisfactory rating"—which would have, in Beberman's view, granted her "procedural rights to time for improvement"—was a "new issue[]" that had not been raised before the Board.  AR 3893.  That claim had first appeared in a "supplemental submission" that Beberman had filed a few weeks earlier in mid-August.  AR 2304, 2314.  And it was based on deposition testimony from Beberman's rater, who apparently said that he gave her a "satisfactory" rating—even though

he really thought her performance was "unsatisfactory"—to avoid giving Beberman a chance to improve via continued access to visa-adjudication systems.  AR 2314.

Beberman then moved to amend her grievance appeal to add new claims, including the one described above.  *See* AR 3938.  In December 2021, the Grievance Board granted in part and denied in part that motion.  AR 4104–21.  But the Board denied on the merits the only claim it permitted Beberman to add.  *Id.*  In September 2022, after discovery into Beberman's VLA violations, the Board issued its final decision denying the rest of her claims.  AR 4721–63.  And finally, in January 2023, the Board denied Beberman's request for attorneys' fees.  AR 4983–5023.

Beberman sued to challenge these denials under the Administrative Procedure Act ("APA"), *see* ECF No. 1, and the parties have cross-moved for summary judgment, *see* ECF Nos. 21, 27.

## II.    Legal Standard

In general, courts review cross-motions for summary judgment under Federal Rule of Civil Procedure 56.  Under that standard, a court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  But when the court reviews a final agency action, it operates as an "appellate court[] resolving legal questions."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).  "The 'entire case' on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citation omitted).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Alston v. Lew*, 950 F. Supp. 2d 140, 143 (D.D.C. 2013).

Under the Foreign Service Act, "[a]ny aggrieved party may obtain judicial review of a final action of the [Foreign Service Grievance] Board . . . in the district courts of the United States."  22

U.S.C. § 4140(a).  The statute provides that the APA, 5 U.S.C. § 706, "shall apply without limitation or exception" to a district court's review of a decision by the Foreign Service Grievance Board. *Id.*  "Under the Administrative Procedure Act, a court may set aside an agency's final decision only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ams. for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (quoting 5 U.S.C. § 706(2)(A)). "[I]n judicial review of agency action, weighing the evidence is not the court's function.  Rather, the question for the court is whether there is 'such relevant evidence as a reasonable mind might accept as adequate to support' the agency's finding . . . ." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. PBGC*, 707 F.3d 319, 325 (D.C. Cir. 2013) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).  Courts "will not disturb the decision of an agency that has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ams. for Safe Access*, 706 F.3d at 449 (alterations, internal quotation marks, and citation omitted). A court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  But a court should not "supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  And an agency's decision may be arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

"[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc); *see also* 22 C.F.R. § 905.1(a) (By State Department regulation, "[i]n all grievances other than those concerning disciplinary actions, the grievant has the burden of establishing, by a preponderance of the evidence, that the grievance is meritorious."). And a moving party is entitled to "judgment as a matter of law" where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990) (citation omitted).

## III.    Analysis

Beberman challenges the Board's (1) handling of her proposed redactions to her July 2012 performance evaluation; (2) handling of her November 2012 performance evaluation; (3) failure to provide her a hearing; (4) failure to award her interim relief; and (5) failure to grant her attorneys' fees. The Court takes each in turn, concluding that the Department is entitled to summary judgment on every claim except for one issue that the Board failed to address.

### A.    Redactions to the July 2012 Performance Evaluation

Beberman contends that parts of the July 2012 Employee Evaluation Report should have been expunged or redacted. She challenges the inclusion of (1) feedback regarding her communication style; (2) a note about her low visa adjudication rate (which she blames on inadequate training); and (3) her request for additional training (which she says falsely suggests that she thought her performance was deficient). ECF No. 21-1 at 27–35.

#### 1.    The Grievance Board's Decision Not to Redact Comments About Beberman's Communication Style Was Not Arbitrary or Capricious

First, Beberman objects to an "Area for Improvement" documented in her July 2012 Employee Evaluation Report. In that report, Deputy Visa Chief Shane Myers, her supervisor and rater

for that period, advised Beberman that "some receiving parties may interpret her direct style and approach as confrontational" and that "her peers have been made uncomfortable at times by her insistence on returning to points already settled."  AR 287.  "We have discussed this," Myers added, and Beberman "is intent on improving this skill."  *Id.*  Beberman argues that the Grievance Board should have redacted this feedback because she was never counseled about her communication style.  ECF No. 21-2 at 27–30.

The Grievance Board has explained that "criticisms, particularly those included in an [Area for Improvement], should not come as a surprise."  FSGB Case No. 2010-046, 2011 FSGB LEXIS 147, at *12 (June 23, 2011).  It has also noted that "before they may be cited in an [Employee Evaluation Report], employees must have the opportunity to correct or improve any cited performance deficiencies as to which they were not on notice."  *Id.*  But a prerequisite for that requirement is a lack of counseling.  And here, the Board reasoned that redactions were unwarranted because Beberman had failed to carry her burden of showing that she had not been counseled.  AR 3871–75.  Instead, the Board credited her supervisor's statements that he had repeatedly counseled Beberman about her communication style.  AR 3872.  The decision not to redact, then, was hardly arbitrary or capricious.

Beberman's protests are unavailing.  First, she argues that the Grievance Board mischaracterized her supervisor's statements.  Not so.  Myers pointed to several times when he counseled Beberman about her communication style before noting that feedback in her July Employee Evaluation Report.  AR 3167.  Beberman homes in on one instance in particular: Myers's claim that he held an "immediate, impromptu, counseling session" "to discuss her communication style" after she submitted a work request for a door modification without telling management, and that she severed a cord holding together a computer cable bundle despite having been "pointedly" asked

10

not to.  AR 3167.  Beberman denies cutting the cord and argues that her actions were well received by her peers.  ECF No. 21-1 at 28.  But whether Myers was *right* that her communication style was perceived as abrasive does not answer whether she received counseling.  So the former question is not the one before the Court—nor was it the question before the Board.  True, Beberman denies being counseled about her communication style during those conversations with Myers.  *Id.* But the Board was entitled to credit her supervisor's statements to the contrary.  As the Board explained, the rater's "specific recollection that he did counsel [Beberman] more than once" about "her difficult communication style" was not "undermine[d]" by his inability to "specifically re-call"—"years later during discovery"—the employees whom Beberman "had made uncomfortable or precisely which discussions were the ones in which she did so."  AR 3872.  Nothing about that credibility determination was arbitrary or capricious.[4]  Similarly, because it is not this Court's job to re-weigh the evidence, Beberman's quibbles on that score do not move the needle.

Next, Beberman argues that the Grievance Board erred by finding that "convincing evidence" showed that counseling happened.  ECF No. 21-1 at 29.  She says that conclusion was wrong because she does not agree that counseling took place, no one witnessed the counseling, and no contemporaneous documentation shows that counseling occurred.  *See id.*  And true

---

[4] Nor was the Board's reasoning, when assessing a supportive comment from a colleague about Beberman's "fortitude" in "speak[ing] truth to power," that "[t]he opinion of the colleague does not have any bearing on the opinion of the grievant's rater who was tasked with assessing her performance, including how she communicated with others on the consular team."  AR 3874. Likewise, Myers had included positive comments in Beberman's Employee Evaluation Report about her communication style with visa applicants.  AR 286.  But again, the Board reasonably found that "[t]hese positive comments about grievant's communications with visa applicants [are] unrelated to how she communicated with her peers during meetings and discussions," and "[t]he accuracy of one criticism about communications in one setting is not undermined by praise for how grievant interacted with foreign nationals seeking visas in a different setting."  AR 3874. Finally, it was not arbitrary or capricious for the Board to consider Beberman's signature on the Employee Evaluation Report attesting to the accuracy of the counseling statement as evidence that counseling occurred.  AR 3872.

enough, the Board acknowledged that "[w]hen there is no documentary evidence of counseling," other forms of "convincing evidence"—such as employee agreement or a witness—can render harmless "the procedural error of failing to document the counseling." AR 3873 (quoting FSGB Case No. 2020-032, at 20–21 (Apr. 23, 2021, corrected)). But what Beberman paints as requirements are just examples of ways for a standard to be met—not necessarily the *only ways* of meeting it. And as already noted, the Board credited Myers's recollection that he counseled Beberman about her communication style during meetings with colleagues and found that not documenting that counseling was harmless. AR 3873–74. That was not arbitrary or capricious, nor was the broader conclusion that convincing evidence showed that oral counseling happened.[5]

### 2.    The Grievance Board's Decision Not to Redact Feedback About Her Adjudication Rate Was Not Arbitrary or Capricious

Beberman next challenges the Grievance Board's decision not to redact feedback on the same July 2012 Employee Evaluation Report regarding Beberman's low visa adjudication rate because, in her view, inadequate training caused any deficiency. ECF No. 21-1 at 30–35.[6] In that report, Myers said that Beberman was "not . . . ready for tenure" "[b]ecause a key responsibility remains a work in progress." 2 AR 44. Citing the high demand for non-immigrant visas and the long backlog for appointments in Venezuela, he stated that "the efficient and judicious adjudication of [non-immigrant visa] applications is the number one priority for all officers assigned to the

---

[5] Still, the Court notes that the Board reached this conclusion partly because it found that Beberman's signature on the Employee Evaluation Report attesting to the accuracy of the counseling statement was evidence that counseling had occurred. AR 3872.

[6] Beberman also challenges the failure of the Board to redact Myers's statement that she "was provided with additional training materials, coaching by the Deputy Visa Chief and peer coaching by more experienced line officers"—a statement that she says is inaccurate. ECF No. 21-1 at 33–34 (internal quotation marks and citations omitted). That argument fails for the same reasons described in this section.

[consular] section." *Id.* And Beberman "initially struggled in this area"; she "rel[ied]" too heavily "on peripheral visa information systems and hesitat[ed] to make decisions when possessing less than perfect information." *Id.* But Myers added several positives: Beberman "increased" her adjudication "speed" during "this rating period"—to the point of "closing in on the average"—"treats each of her individual applicants with courtesy and respect," "is well versed in the law and visa regulations," and "has expressed a desire for additional training in order to continue to develop her skillset as a line officer." *Id.* He concluded that Beberman's "performance has steadily improved and" that "she has both expressed and demonstrated the willingness and desire to focus on those areas necessary to succeed as a Foreign Service Officer." *Id.* So he "fully expect[ed] she will continue to build on these successes in the coming rating period and remain on track for tenure." *Id.*

The Grievance Board found that Beberman had not shown "by preponderant evidence that she received inadequate training that was directly responsible for her comparatively low visa adjudication and refusal rates." AR 3879–80. True, her rater had "a limited memory of what specific training he provided to" Beberman. AR 3883. But that did not mean that she never received training—or that the training she did get was insufficient. Instead, the Board found that Beberman "received much coaching, training, and mentoring"—a conclusion supported by a counseling session between Beberman and Myers in February 2012, in which Myers documented "coaching by Deputy [Visa] Chief, goal setting meetings with the Chief, peer coaching, brown bag meetings focused on applicant pool and adjudication strategies in addition to the basic and ongoing training program." AR 3881, 3883. The Board also relied on her second-level reviewer's recollection that Beberman, after arriving in Caracas, shadowed a more experienced officer before handling "simple visa adjudications." AR 3880. More than that, Beberman then received a "written orientation

program" and eventually took her place on the visa line, and Myers also provided more training. AR 3880–81. Still, the Board reasoned that even if Beberman had not received the full six-week training program at Caracas, she had not established "a nexus between her training at post, or lack thereof, and her performance deficiencies on the visa line." AR 3883. And the Board was "persuaded by the Department's argument: the basic" consular course "provides sufficient training to equip a first-time consular officer with the necessary skills to do his or her job on the visa line," and "any additional training at post"—while "helpful"—is "not essential." *Id.*

That decision was not arbitrary or capricious. Beberman concedes that she completed the basic course ("ConGen") in Washington, D.C. ECF No. 21-1 at 31. Beyond that, she disputes whether ConGen was in fact helpful, and whether she completed the six-week training program in Caracas. *Id.* at 31–32. Plus, she identifies several gripes that she had with her extra training: she would have liked a more experienced mentor; the brown-bag luncheons were discontinued at one point, the materials that Myers gave her in an "ongoing training" email were not "instructional" or "helpful"; and Myers did not follow through on his offer to provide her with peer-to-peer training. *Id.* at 32–34. But once again, the Grievance Board was entitled to credit her supervisor's statements to the contrary.[7] And Myers's statement that "there's a training continuum for consular

---

[7] The Board summarized that evidence, in part:

> Grievant's rater acknowledged that his post training program consisted of a "six-week program . . . with three weeks of training and then three weeks of follow-up with a reviewer." He also testified that he worked with grievant during the first few days of her training at post but left for home leave for a period of a few weeks. The reviewer then explained that when grievant arrived at post, "[l]ike any other new officer in her situation," she was assigned to shadow a more experienced officer for a few days. (Presumably this was her rater.) Then, according to her reviewer, she began to handle "simple

officers," who "require additional training" "over the course of a career," does not change that result. AR 2502. Indeed, Myers also testified that ConGen "provides the necessary skills to utilize the consular systems," "to apply the law to the situation," and "to provide the tools necessary to research or find answers in the Foreign Affairs manual, in cable traffic, through consultations, and so on and so forth." *Id.* No doubt, Beberman nitpicks just how effective that training was. But at bottom, especially because the "grievant bears the burden of proving that this claim is meritorious," the Board was on solid ground when it found "that she has not proved that the [Employee Evaluation Report] should be expunged because she allegedly received insufficient training." AR 3883. That conclusion, in other words, was supported by substantial evidence and was not arbitrary or capricious.

### 3. The Grievance Board's Decision to Not Redact Beberman's Request for Additional Training Was Not Arbitrary or Capricious

Beberman also challenges the Board's decision not to redact Myers's statement that Beberman "expressed a desire for additional training in order to continue to develop her skillset as a line officer." ECF No. 21-1 at 34 (internal quotation marks and citation omitted). That assertion, she contends, "underscores grievant's performance deficiencies and adds that [she] seemingly agreed to the assessment by communicating a desire to improve." *Id.* The Grievance Board disagreed, finding instead that the statement (1) was accurate and (2) reflected only that Beberman had "expressed a desire for additional training in order to continue to develop her skillset as a line

---

visa adjudications;" she received a "written orientation program;" and eventually, she took her place on the visa line.

AR 3880 (citations omitted). And the rater "acknowledge[d] that he discussed [with Beberman] multiple ways to close gaps or to make her feel more comfortable with the training that she had received in ConGen and actually applying it in the field." AR 3882 (internal quotation marks and citation omitted).

officer." AR 3884–85. In this way, the Board distinguished another case when it redacted a similar statement that the employee "earnestly wanted to improve his performance"—which, in that context, was "not a statement of praise." AR 3884 (citing FSGB Case No. 2018-052, at 17 (June 25, 2019)).

That decision was not arbitrary or capricious. Beberman concedes that it was true, leaving only the question of unfair prejudice. *See* ECF No. 21-1 at 30 (Beberman arguing that she "repeatedly requested additional training"). On that score, she relies on Myers's deposition response: when asked why he included the statement in her evaluation, he said that he did so "[b]ecause at the top I said that she is not, at this time, ready for tenure." *Id.* at 34 (citing AR 2534). So, Beberman argues, "Myers perversely used her request for training negatively against her to imply that she agreed with his assessment." *Id.* But the Grievance Board found that nothing about this case suggested that Beberman's "request for more training" was a "seemingly tacit agreement." AR 3884. After all, her Employee Evaluation Report lacked an "analogous statement . . . by the rater that he thought grievant needed additional training." *Id.* Beberman does not grapple with that distinction and thus fails to explain why (or how) the Board's interpretation was arbitrary or capricious.

### B.    Redactions to the November 2012 Performance Evaluation

Beberman also challenges the Board's decision not to redact parts of her November 2012 performance evaluation or expunge it entirely.

### 1.    The Grievance Board's Decision to Not Shorten the November Rating Period on the Front End Was Not Arbitrary or Capricious

Beberman argues that the performance evaluation's rating period—July 26, 2012, to November 7, 2012—is inaccurate and should have been about a month shorter on both the front and back end. *See* ECF No. 21-1 at 12–18. The period should have started a month later, she says,

because she did not know who her rater would be until August 29.[8]  *Id.* at 13–15.  And it should have ended over a month earlier—in mid-September—because Beberman took leave on September 14, lost access to the consular systems four days later, and was unable to perform what she says were most of her work requirements.  *Id.* at 15–18.

To begin, the Grievance Board rejected Beberman's contention that she did not know her rater's identity until late August.  AR 4120.  The Board noted Department regulations that "[t]he rating officer is usually the rated employee's immediate supervisor; if not, the employee must be advised at the beginning of the rating period as to who will be the rating officer."  ECF No. 40-1 at 4; ECF No. 40-3 (3 FAH-1 H-2813.1(a), (b)); AR 4120.  True, because Beberman's immediate supervisor (Myers) left in July, she should have been informed at the beginning of the rating period that Visa Chief Eric Cohan would be her rating officer.  But the Board found unpersuasive the "single piece of evidence" presented that she was unaware of who her rater would be: "an August 29 email generally announcing raters for visa officers."  AR 4120.  Rather, Beberman "herself stated in the record that the rater actively began observing her from his arrival."  *Id.*  And that record also "contains several emails and other documents describing supervisory encounters between them during this period."  *Id.*  In any event, the Board noted as well that the regulatory phrase "at the beginning of the rating period" plausibly meant "within the first month."  *Id.*  All told, the Board found "neither error nor harm."  *Id.*

That conclusion was not arbitrary or capricious.  Beberman faults the Board for not "referenc[ing]" any "evidence of these supposed 'emails and other documents describing supervisory encounters' or the dates upon which such emails were sent or encounters occurred."  ECF No. 34 at 9.  But that misunderstands the Court's role in reviewing the agency's decision.  No matter what

---

[8] Her second-level reviewer was unchanged from the July rating period.

specific evidence the Board was referring to, Beberman does not dispute that Cohan—her rater—"coached [her] upon his arrival" in late July.  AR 516.  As visa chief, he was "responsible for all the visa officers," and he testified that he would have known about and observed Beberman's performance.  AR 3073.  Otherwise, Beberman argues that Cohan could not remember specific instances of supervising her nine years after the fact.  ECF No. 34 at 9; *see* AR 2376.  But that contention falters for a now-familiar reason: an understandable gap in recollection by Department employees does not render the Board's decision arbitrary, capricious, or unsupported by substantial evidence.  Finally, even if the Board erred in that respect—*i.e.*, assuming it was arbitrary or capricious to conclude that Beberman had not carried her burden to show that she did not know who her rater would be before the end of August—she offers no persuasive reason why the Board erred in interpreting "at the beginning" as plausibly meaning "within the first month."  *See* ECF No. 21-1 at 13–14.[9]

But the end date is a different matter.  The Grievance Board at first found that Beberman's "claim[] that the rating period should have begun on August 29, 2012 and ended on September 18, 2012 . . . ha[s] not been previously raised," and thus was "not properly before the Board."  AR 3890–91.  Beberman then moved to amend her grievance to add that claim, AR 3942–48, which the Board granted only as to the first month of the rating period, AR 4118–21.  And as just discussed, the Board then reached the merits.  The Board did not, however, address whether to permit an amendment to add Beberman's claim that the tail end of the rating period was misleading.  True, it rejected Beberman's "contention that the description of the rating period as starting on July 29,

---

[9] Beberman's argument that it was improper for her rater to consider the visas she issued on July 30, August 9, and August 20, 2012—before she says she was advised of who her rater would be—fails for the same reason.  ECF No. 21-1 at 24–25.  Cohan also explained in the Employee Evaluation Report that he specifically counseled Beberman about these incidents.  AR 21.

2012 and ending November 7, 2012[] is harmful error," which could be read as a conclusion that the timing of the end date did not harm Beberman. AR 4120. But even so, the Board explained no such conclusion. And the Board was clear that it granted Beberman's motion only "with respect to the first month of the rating period," without acknowledging the other half of her claim. AR 4121. The Court is sympathetic that Beberman's arguments can be long and, at times, difficult to follow, and the flip side of this argument could have been lost in a motion to amend largely focused on the first month of the rating period. But the Court cannot "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (citations omitted). And the Board's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem." *Id.* So too here. Thus, the Court will remand to the Board to consider whether to permit Beberman to amend her grievance to challenge the November 2012 end date of her rating period, and if so, to address the merits of that claim.[10]

### 2. The Grievance Board's Decision That a "Satisfactory" Rating Did Not Unlawfully Deprive Beberman of Substantive Rights Was Not Arbitrary or Capricious

Beberman argues that she should have been given an "unsatisfactory" rather than "satisfactory" rating because the lower rating would have entitled her to counseling and an opportunity to improve under Department regulations. ECF No. 21-1 at 5–12. The Grievance Board rejected that claim in its September 2021 interim decision, noting that this claim was a "new issue[] that ha[d] not been raised before the Board"—and thus a claim that the Board need not reach. AR 3893; *see also* AR 4115–18 (denying motion to amend). But the Board also held that "the substantive obligation to provide an opportunity for an employee to improve is not unqualified even

---

[10] The Court is unimpressed with the Department's briefing on this issue, which wrongly implies that the Grievance Board ruled on the merits and maintained that position even after Beberman repeatedly identified this error in her opposition. ECF No. 37 at 7–8.

where the period for improvement is formally required, as in the case of an unsatisfactory rating."
AR 3893. This reasoning tracked the Department's argument: Beberman's "rater erroneously
marked 'satisfactory' under the mistaken impression that an unsatisfactory rating" would neces-
sarily "trigger the requirement for additional time to improve." AR 3038. True, an unsatisfactory
rating would in "most cases" provide that extra improvement time. *Id.* But the Department con-
tended—and the Board agreed—that Beberman's case was different in kind. As the Board ex-
plained, "the Department's obligation to allow [a] grievant a reasonable period for improvement"
can be—and was here—"outweighed by the obligation to safeguard national security in the visa
function by removing an employee who appeared unable or unwilling to heed guidance or adhere
to policy and regulations in issuing visas." AR 3893; *see also* AR 3038 (Department contending
that ordinary rule did not apply to Beberman "due to her persistent failure to adhere to consular
regulations").

The Board's decision was not arbitrary, capricious, or unsupported by substantial evidence.
In reasoning that employees need not *always* receive time to improve their performance, the Griev-
ance Board described other decisions finding that, in cases of misconduct, employees are not en-
titled to remain at their posts just to have an opportunity to improve. *See* AR 3893–94 (citing
FSGB Case No. 2002-054 (June 17, 2003)). For example, when immediate curtailment is or-
dered—or where "a medical evacuation or other circumstances prevents an employee from having
an opportunity to improve"—"employees do not have an unqualified right to be given time to
improve their performance" before their evaluation can mention a performance problem. AR
3894.

Despite quibbling with the analogy, Beberman offers no basis for vacating the Board's
decision under the APA. To start, the Board never said that Beberman's case was just like the

other ones.  Rather, those cases support a principle relevant to Beberman's claim: there is no un-qualified right to extra improvement time.  *See* AR 3894.  And the Board explained why that principle applied to Beberman, whose rater "believed that allowing [her] to continue on the visa line would [have] be[en] a dereliction of duty"—one posing "an unacceptable risk to U.S. border security."  *Id.*  Recall that Beberman's performance was so concerning on this front that it "com-pelled" her rater "to disable her access to all consular systems."  AR 21.  So although she argued that her case was "180 degrees apart" from a grievant who had "raised serious concerns regarding . . . judgment, integrity, reliability[,] and trustworthiness," AR 3227 (internal quotation marks and citation omitted), the Board reasonably credited the evidence that the Department had precisely those worries about her.  In that context, it makes sense that the general right to improvement time would give way to serious national-security concerns.  A different rule, after all, would force the Department to permit Beberman time to improve even though it believed that her performance was threatening enough to justify removing her access to the key systems.  And the Board's decision that the right to improvement time did not impose that catch-22 on the Department in this case was neither arbitrary nor capricious.  That conclusion draws extra support, moreover, from Beberman's contention that "a VLA violation may be reported without the Foreign Service Officer first having been afforded counseling and an opportunity to improve."  ECF No. 21-1 at 45.[11]

Beberman also argues that no evidence supports the inference that she "appeared unable or

---

[11] Beberman argues that the analogy is inapt because, unlike those removed from duty for misconduct, she remained in her post for two months after losing access to the consular systems but still had no opportunity to improve.  ECF No. 21-1 at 9.  Yet the Board's point stands: Depart-ment employees do not have an unqualified right to a chance to improve their performance if giving them that opportunity—here, reinstating her access to the consular systems—would endan-ger the security of the visa-issuance process.  Beberman could do the rest of her work the two months she remained at her post, and it was only because she asked to leave Caracas that her post there ended when it did.

unwilling to heed guidance or adhere to policy." ECF No. 21-1 at 9–10. But the Board explained that "given her well-documented resistance to guidance throughout her time at post, her supervisors were justified in concluding that no amount of additional guidance or training would sufficiently improve her performance." AR 3894. And substantial evidence supports that conclusion. When the supervisor in charge of rating a person's performance says that permitting the person to keep adjudicating visas "would be a dereliction of duty" and create "an unacceptable risk to U.S. border security," that is evidence that the person will not—for one reason or another—follow the rules. *Id.* And other aspects of her evaluation bear that problem out. For example, when Cohan "explained [his] concerns" about a specific visa issuance, Beberman responded that "she was correct in issuing the visa." AR 21. The evaluation adds that Beberman herself "stated that . . . she believed she would be unable to perform to [her supervisor's] expectations with respect to visa adjudication." AR 22. Nor did she "appear receptive to counseling" before she lost access to the consular systems. *Id.* To the contrary, "[r]epeated mentoring or counseling sessions . . . never had the desired effect." AR 23. Beberman was instead "unyielding" in her belief that her performance was unproblematic: she said that "her judgment was equal to or superior to all" of her peers, "and she continued to defend this point of view in a counseling session." *Id.* This evidence, substantial by any definition, underpins the Board's conclusion that Beberman failed to follow the rules and that she was either unable—or unwilling, or both—to fix those deficiencies.[12]

That said, the Court takes Beberman's general point that this aspect of her rating process should have played out differently. Cohan, who gave her the "satisfactory" rating, explained that he did so because Beberman's "performance and the gravity of the anomalies had made it

---

[12] That the VLA violations here were "close matches"—meaning the applicant was not the alien named in the visa lookout system—does not change the Court's conclusion, and Beberman offers no persuasive reason it should. *See* ECF No. 21-1 at 72–75.

impossible for" him to give an unsatisfactory rating and the attendant "time required by then-3 FAM 2248." AR 4004. But the Court's task is not determining whether Cohan handled things ideally. Again, even if the quality of Beberman's work merited that lesser rating, the Board reasonably found that this case presented unusual circumstances. And given those circumstances surrounding Beberman's performance problems, it was not arbitrary or capricious for the Board to decide that—because the Department needed to ensure that the serious, concerning, and unusual deficiencies in Beberman's work did not jeopardize national security—she need not have been provided time to fix those problems even if her evaluation mentioned them.

### 3. The Grievance Board's Decision to Not Expunge Beberman's VLA Violations Was Not Arbitrary or Capricious

Next, Beberman contends that the Grievance Board's determination that she committed VLA violations was wrong, both procedurally and substantively, and that the Board should have redacted any references to them in her employee evaluation. ECF No. 21-1 at 46–90.

Beberman throws everything at the wall, *see* ECF No. 21-1 at 46–75, but her main argument is that a VLA violation can happen only if the Department determines that the visa applicant whose name appeared in the hit was indeed the individual to whom the hit applied. She argues that because "[t]he Department failed to prove that any applicants were the hits on the visa lookout system before finding that Ms. Beberman had committed four VLA violations," any references to those violations "must be redacted." *Id.* at 52. Disagreeing, the Grievance Board found that Beberman "is reading into [the VLA Law] an additional restrictive criterion that" its "plain language" "does not support." AR 4756–58. That decision was not arbitrary, capricious, or otherwise contrary to law.

The Court begins by clarifying the legal standard. After *Loper Bright Enterprises v. Raimondo*, courts no longer "defer to an agency interpretation of the law simply because a statute is

ambiguous." 603 U.S. 369, 413 (2024). Instead, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412. So the Court does that here.

The VLA Law requires consular officers to "certify[] in writing"—*before* issuing a visa—"that a check of the Automated Visa Lookout System, or any other system or list which maintains information about the excludability of aliens under the Immigration and Nationality Act, has been made and that there is no basis under such system for the exclusion of such alien." Pub. L. 103-236, § 140(c)(1)(A) (codified at 8 U.S.C. § 1182 note). And § 140(c)(1)(B) specifies the consequences of non-compliance:

> If, at the time an alien applies for an immigrant or nonimmigrant visa, the alien's name is included in the Department of State's visa lookout system and the consular officer to whom the application is made fails to follow the procedures in processing the application required by the inclusion of the alien's name in such system, the consular officer's failure shall be made a matter of record and shall be considered as a serious negative factor in the officer's annual performance evaluation.

Beberman argues that failure to follow the relevant procedures is not enough to constitute a VLA violation under § 140(c)(1)(B). Rather, the "alien's name" must be "included" in the visa lookout system and, as she would have it, the applicant must be the same person whom the system refers to as ineligible for a visa. *See* ECF No. 21-1 at 50. But as the Board reasoned, Beberman's interpretation of the statute would rewrite the statute's reference to the alien's "name" to mean the alien's "identity" (or the alien himself). AR 4756. And as the Department puts it, "the plain language of the statute" shows that "even if the hit turns out to be a false positive (for instance, because two individuals share the same name), the violation occurs when the officer fails to follow

the appropriate procedures for identifying that the match is a false positive." ECF No. 27-1 at 31.[13]

Beyond that, Beberman says that she acted in good faith by overriding the hits in the visa lookout system. ECF No. 21-1 at 52–61. By regulation, an officer "must make a good-faith effort to properly resolve valid hits before visa issuance." 9 FAM App. G, 101.1(a). And "[f]ailure to make complete and accurate notes or to follow FAM guidance indicates a failure to make a good faith effort." *Id.* (emphasis removed). The Grievance Board found that Beberman "fell short of a good faith effort in her visa adjudications, notably" by failing "to provide complete and accurate notes." AR 4760–61. Beberman recounts at length her after-the-fact justifications for issuing these visas. ECF No. 21-1 at 52–61. But it was her lack of explanation *at the time*, not merely her decision to issue the visas despite the hits, from which the Department concluded Beberman committed the four VLA violations referenced in her file.

Beberman expresses some understandable frustrations. "[S]he had limited her note taking . . . per her supervisors' direction[] to increase her adjudication rate," and she again blames a lack of training. ECF No. 21-1 at 54–61. But as the Grievance Board explained, Department regulations advise officers to "be clear in your case notes, especially" when "there is a close match," and "be sure to add a case note explaining your reasoning" if "you eliminate a hit based on your understanding of the local naming conventions." AR 4758 (quoting 9 FAM App. G, 101.1-1(b), (c)).

---

[13] In arguing otherwise, Beberman contends that "Congress did not intend for consular officers to be subject to serious career consequences for granting visas to applicants who are not known to be a criminal or national security threat." ECF No. 21-1 at 46; *see also id.* at 50–51. But even if the Court were to credit Beberman's theory that Congress intended to limit the deterrent effect of the law, which she presents without citation to any authority, the Court is not persuaded and will not "resort to legislative history to cloud a statutory text that is clear." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 212 (D.C. Cir. 2013) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994)).

Further still, Beberman's rater advised all visa officers in a June 2012 email that "your case notes have extremely large potential audiences and" thus "need to accomplish a few goals," including showing "why you made the decision you made." AR 4758–59 (citation omitted). That Beberman "chose to interpret advice to shorten her notes in routine cases as grounds to ignore the requirement to indicate why she had overridden a hit does not speak to her lack of training." AR 4759. And in any event, as the Board noted, "VLA violations may be found even in cases where the officer had no training at all" because "[m]itigating circumstances are relevant not to the VLA determination itself." AR 4761–62.[14]

Beberman's last attack on the Grievance Board's reasoning is that the Board parroted its interim decision while failing to undertake a "full and fresh" review of the record in its final decision. ECF No. 21-1 at 61–62. She relies on a Board decision from 1993, which observed that a "grievant might establish a basis for relief" with "fuller evidence and argument"—a "possibility" that "[t]his interim order in no way prejudges." FSGB Case No. G-92-083-STATE-61, 1993 FSGB LEXIS 132, at *4 (Jan. 8, 1993). So "[w]hen the record of proceedings has been completed, the Board will consider the merits of the case and the positions of the parties fully and freshly, without reference to this order." *Id.* But in that case, the Board had done only a "preliminary analysis" of the grievant's submission. *Id.* at *3. As a result, it was "unable to discern any basis for distinguishing his contentions from the positions in the parallel grievances which the Board found not to merit relief," so the Board "conclude[d] preliminarily, at [that] initial stage of the proceedings, that grievant [had] as yet demonstrated no realistic possibility that he [would] prevail." *Id.* at *3–4. By contrast, the Board's decision here denying Beberman interim relief from

---

[14] Beberman's argument that the VLA Panel and Managing Director failed to consider whether she made a good-faith effort adjudicating the four visas fails for the same reasons. *See* ECF No. 21-1 at 62–65.

separation was thorough and well-reasoned, as was its final decision.  AR 1438–98; AR 4718–63; *see also* AR 1621–43 (denial of motion for reconsideration of order denying interim relief).  Beberman identifies no specific evidence or argument that she believes the Board gave short shrift to in its final decision, and the Court finds that it "sufficiently articulate[d] the requisite rational connection between that conclusion, upholding the four VLA violations, and its factual findings."  *See* ECF No. 21-1 at 62 (citation and alterations in original omitted).

Beberman also challenges the decision and process by which the VLA Panel found the four violations in the first place and the Visa Office Managing Director denied her appeal.  ECF No. 21-1 at 76–90.  She insists that the Managing Director did not adequately explain his reasoning or address her explanations for issuing those visas; that the Visa Office needed to (but did not) obtain a Consular Integrity Division ("CID") report before convening the Panel; that she was denied access to evidence that would have supported her appeal; that a member of the VLA Panel harbored bias against her; and that her November 2012 rater violated Department regulations by seeking out evidence of VLA violations in her adjudication history.  *Id.*  But none of these alleged deficiencies holds water.

First, as the Grievance Board explained, nothing in the Manual requires the "Managing Director, in affirming the documented results of the VLA Panel deliberations," to "provide the officer with a detailed refutation of any argument that officer has chosen to present."  AR 4748.  Beberman argues that "[t]o enable the [Grievance Board] intelligently to review the [Managing Director's] determination, the [Managing Director] must provide . . . a statement of reasons supporting [his] determination."  ECF No. 21-1 at 76 (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 571 (1975), *overruled on other grounds by Local No. 82, Furniture and Piano Moving v. Crowley*, 467 U.S. 526 (1984)) (alterations in original, though they have been modified for clarity).  But

Beberman's brackets materially alter the original quote. Of course, the agency or department must explain the reasons for its final decision for the *Court's* review. But that is all *Dunlop* says. In contrast, the Managing Director's decision is not a final agency action reviewable by this Court, so that requirement is inapplicable. *See* 22 U.S.C. § 4140(a).

Second, the Grievance Board rejected Beberman's argument that the VLA Panel had to seek a CID report on her visa adjudication history before it could adjudicate the alleged violations because that theory (again) contravenes the Foreign Affairs Manual. AR 4747–48. The relevant provision requires a referral to CID when the Panel needs "to ascertain if the VLA violation is a single occurrence, or if it is part of a pattern." 9 FAM App. G, 101.5(b). But here, the Department "was presented with four potential [VLA] violations, not one," so the Board found that "it had already been established that there was not a 'single occurrence.'" AR 4748. That decision was not arbitrary, capricious, or contrary to law.

Third, the Grievance Board found that none of "the information [Beberman] requested was relevant to her appeal." AR 4750. She sought, for example, "extensive numerical data on adjudication rates, total issuances and [Security Advisory Opinion] requests submitted by each visa officer at post during" her time there—all "to support her claim that she was generally diligent about following procedures and should have therefore been credited with good faith efforts to exclude hits in these four cases." *Id.* But as the Board explained, "[t]he law . . . and the FAM regulations implementing it[] do not offer any basis on which to dismiss a potential VLA violation because the officer generally followed procedures in other cases, or because other officers were arguably less diligent." *Id.* And in another instance, Beberman requested access to "the applications of family members who applied with the individual to help [Beberman] reconstruct her reasoning for overriding the hit." AR 4751. Here, the Board found persuasive the reasoning of Visa Chief Bent:

Beberman's "case notes" included "no notes to that effect," so it seemed that Beberman was "seeking to justify and build a case for issuance after the fact." *Id.* "The focus," though, "is on the specifica [sic] visa case, the hit, and what actions [Beberman] did or did not take." *Id.* And again, "[t]he FAM requires visa officers not only to resolve the hit, but to offer a clear explanation in the case notes as to how they resolved it." *Id.* The Board's decision on this issue passes muster under the APA too.

Beberman counters that Bent (who was on the VLA Panel and also denied her request for evidence) was biased against her. Her theory rests on his statement to her that "[s]everal very experienced officers have looked at these and have determined that you did not follow proper procedures," so "[u]nless you have some other information regarding the hits, the actions you took, etc., I am not sure what more needs to be done here." ECF No. 21-1 at 80 (quoting AR 712–13). Apparently, Bent also told Beberman in 2021 that David Franz, who worked for the Visa Office from the Caracas embassy, was not involved in her case. *See id.* at 82. As Beberman would have it, that was a cover-up. She had sought Franz's recusal, but the Board did not believe that Franz was biased against her; he "was not on [Beberman's] panel," and "[h]is role appeared to be largely administrative: referring allegations to the proper office and drafting a routine, required memo after the fact." AR 4750. Still, Beberman claims that Franz *was* involved—and that Bent knew about it—because in 2012 Franz sent an email "looping in" Bent regarding the investigation of Beberman's adjudications, and Franz drafted a 2012 memorandum notifying Human Resources about the VLA violations. ECF No. 21-1 at 82 (citations omitted).

The Grievance Board found that these allegations of bias were "no more than frivolous speculation, unsupported by anything in the record beyond [Beberman's] own 'Declaration' describing [her] view of events." AR 4750–51. In the end, Beberman shows at most that a member

of the VLA Panel suggested she had little to gain by proceeding with a weak case, and that he correctly noted in 2021 that a particular employee of the Visa Office was not involved with her case beyond some limited participation in the original proceedings almost a decade before. None of that suggests meaningful bias in the proceedings against her, and the Board's decision to that effect was not arbitrary or capricious.

Finally, Beberman contends that Cohan—her November 2012 rater, who had identified the VLA violations in the first instance—violated Department regulations by "targeting" her with a "deep review" of her adjudications. ECF No. 21-1 at 87. But a potential VLA violation may be detected in "any number of ways," 9 FAM App. G, 101.5(a), and "[h]owever the potential case becomes known, it must be presented to the Post Operations Division . . ., whose chief coordinates the VLA violation process," *id.* at 101.5(b); *see also* AR 4744–45. So the Grievance Board found "no violation of the FAM provision": "[o]nce the [rater] became aware of potential violations, he acted in accordance with his obligation to report such cases." AR 4755. That decision was sound. Beberman contends that Cohan's reasons for investigating her were somehow improper. More precisely, she objects to what she calls an "illegal" policy of "setting an arbitrary post-wide refusal rate and penalizing officers who do not follow it," which "constitutes arbitrary and capricious differential treatment of employees." ECF No. 21-1 at 89–90. But Cohan reasonably reviewed her visa adjudications partly because of her extremely low visa refusal rate. AR 21. And the Board "accepted the Department's explanation that a refusal rate so far out of line with that of other officers, whether higher or lower, could indicate questionable judgment"—and that "an exceptionally low refusal rate might suggest inadequate scrutiny of applicants." AR 4745. Once again, that decision was not arbitrary or capricious.

### 4.    The Rest of the Grievance Board's Selective Redactions Were Not Arbitrary or Capricious

Finally, Beberman seeks to redact parts of her November 2012 performance evaluation or expunge it entirely because it was "seriously imbalanced" and "unfair."  ECF No. 21-1 at 18–27; *see* AR 3895, 3900–16.[15]  The Grievance Board disagreed.  It explained that "[a]lthough [Beberman's] performance issues in her primary responsibilities naturally influenced the assessment of the majority of her work, the rater also assessed positively, without negative innuendo or minimizing comments, her performance on other work requirements."  AR 3898.  And the positive assessments of Beberman's performance in contexts that "did not involve consular work" did "not call into question the negative assessment of her performance" in Caracas.  AR 3898–99.  Nor did the Board find that the challenged statements were inaccurate or falsely prejudicial, although it did sua sponte redact as unnecessarily repetitive two other passages noting that her access to consular systems had been revoked, including a comment comparing her visa refusal rate to that of other officers.  AR 3904, 3906–08, 3909, 3911, 3913, 3915.

None of these decisions was arbitrary or capricious.  As the Board explained, an Employee Evaluation Report must "fairly and accurately describe[] and assess[] performance and potential with adequate clarity and documentation to constitute a reasonably discernible, objective, and balanced appraisal."  AR 3897 (quoting FSGB Case No. 1993-015, at 7 (Dec. 23, 1993)).  And it acknowledged that "a statement, or group of statements, in an [Employee Evaluation Report] can be unfair without being inaccurate."  AR 3899.  The Grievance Board then reviewed each passage that Beberman challenged and found that they were not unfairly prejudicial.  That decision was

---

[15] Beberman's efforts to expunge references to specific VLA violations are considered separately above.

well reasoned, and though Beberman continues to disagree with the outcome, she offers nothing to suggest that it was arbitrary or capricious.

### C.    Beberman Was Not Entitled to a Hearing

Beberman also argues that reporting a VLA violation is a disciplinary measure entitling her to certain procedural rights—specifically, a hearing at which the Department would need to show that the disciplinary action was justified before including the violations in her evaluation. ECF No. 21-1 at 37–46.  The Foreign Service Act provides that the Grievance Board "shall conduct a hearing at the request of a grievant in any case which involves" a "disciplinary action or the retirement of a grievant."  22 U.S.C. § 4136(1)(A).  At such hearings, the Department bears "the burden of establishing by a preponderance of the evidence that the disciplinary action was justified."  22 C.F.R. § 905.2.  The Board, however, found that reporting a VLA violation is not a "disciplinary action" requiring such a hearing.  AR 3886–88.  That reasoning was sound—and certainly not arbitrary or capricious.

The Grievance Board's reasoning was straightforward: references to VLA violations in an employee's performance evaluation are not disciplinary action.  As the Board explained, "[n]owhere does the law itself" or the Manual "characterize this action as 'disciplinary.'"  AR 4736.  To the contrary, the latter defines "disciplinary action" as any "[a]ction against an employee in the form of a reprimand, suspension, or separation for cause."  3 FAM 4312.  And the Board found that "memorializ[ing]" "faulty performance . . . in a performance evaluation is certainly not the same as prescribing the consequences that could or should result in a disciplinary action."  AR 4736 (quoting FSGB Case No. 2015-035, at 8 (Dec. 8, 2016)).  The Board analogized to "other elements of performance"—even those which require mention such as adherence to security procedures or Equal Employment Opportunity obligations—which do "not constitute discipline" in

the Manual "or carry with it the procedural rights associated with a disciplinary action, such as a shift in the burden of proof or entitlement to a hearing." AR 3887.

That calculus does not change just because the VLA Law requires that VLA violations be documented in an employee's performance evaluation as a "serious negative factor." Pub. L. 103-236, § 140(c)(1)(B) (codified at 8 U.S.C. § 1182 note). As the Grievance Board explained, "[t]he command to document the misconduct is simple and straightforward," and it is a "different personnel procedure[] that exist[s] independently" of any disciplinary action or other consequences. AR 4736 (citation omitted). Though the Board has sometimes referred to VLA violations as an "infraction[s]" or "offense[s]," it has done so when pursuing discipline—such as a suspension or other adverse employment action—*because of* the violation.[16] And even if such a violation were considered an "infraction" or "offense," that alone would not trigger the full procedural protections of the hearing that Beberman envisions.[17]

Beberman resists this commonsense conclusion by arguing that Congress had the "express intent to hold consular officers accountable for granting visas to ineligible applicants through a disciplinary procedure." ECF No. 21-1 at 45. In support, she leans on part of a joint explanatory statement accompanying a House Conference Report, which describes the conference substitute that became law (as well as the House and Senate versions) as "establish[ing] 'disciplinary procedures' for consular officers." *Id.* at 39 (emphasis omitted) (quoting H.R. Conf. Rep. No. 103-482

---

[16] *E.g.*, FSGB Case No. 2006-053, 2007 FSGB LEXIS 226, at *1, *10–14 (June 26, 2007); FSGB Case No. 2010-029, 2011 FSGB LEXIS 133, at *1 (Feb. 10, 2011).

[17] To the contrary, as the Grievance Board reasoned, "[t]he Visa office has established the applicable procedures by which a determination is made that an officer committed a VLA violation," and "[Beberman], in fact, exercised her right to appeal the VLA determinations to the Visa Office Managing Director, the responsible authority charged with reviewing and deciding her appeal." AR 1863.

at 166).  But that excerpt is just an explanatory statement.  The statutory *directive* to the agency

provides only that when a consular officer "fails to follow the procedures in processing the appli-

cation required by the inclusion of the alien's name in such system, the consular officer's failure

shall be made a matter of record and shall be considered as a serious negative factor in the officer's

annual performance evaluation."  Pub. L. No 103-236, § 140(c) (codified at 8 U.S.C. § 1182 note).

As the Board explained, the VLA Law is clear that making such a violation "a matter of record"

does not, alone, constitute disciplinary action, and "[e]xtrinsic materials have a role in statutory

interpretation only to the extent they shed a reliable light on the enacting Legislature's understand-

ing of otherwise ambiguous terms."  AR 1427 (quoting *Exxon Mobil Corp. v. Allapattah Servs.,*

*Inc.*, 545 U.S. 546, 568 (2005)).  The Court agrees.

Beberman also points to a Department cable sent in July 2012 informing consular officers

that the VLA Law subjects to disciplinary action "those who issue visas over adverse lookout

information without clear justification."  ECF No. 21-1 at 41 (citation omitted).  But the Grievance

Board was again unpersuaded.  Instead, it concluded that the cable did "not constitute or document

any official Department policy otherwise so at odds with the clear language of the law and the

[Manual]."  AR 4736.  The Board explained that the cable merely warned officers that they were

"subject to" disciplinary action should they commit VLA violations.  And "subject to disciplinary

action" "does not exclusively mean one will be disciplined, as the words 'subject to' most reason-

ably are interpreted to mean 'at risk' or 'has the possibility' to face a particular consequence or

circumstance (e.g., a neighborhood near a creek may be subject to flooding)."  *Id.*  That conclusion

was not arbitrary or capricious.[18]

---

[18] Beberman argues that the Department changed its interpretation of the law (as previously

articulated, she says, in this July 2012 cable), and it cannot apply that supposedly changed

As it turns out, Beberman *did* face disciplinary action because of the VLA violations documented in her performance evaluation, and this forms another putative basis for her claim that she was entitled to a hearing.  True enough, she received a one-day suspension in January 2014.  AR 476.  So she was entitled to a hearing at which the Department would need to show that the suspension was justified before she served it.  *See* 22 U.S.C. § 4136(1)(A); 22 C.F.R. § 905.2.  And although the hearing never happened, Beberman can hardly complain about why.  The agency granted her interim relief from the suspension, and she left the State Department almost six years later—in October 2019—*without ever serving it*.  ECF No. 34-1 ¶¶ 67–71.  The next year, after Beberman had left, the agency rescinded her suspension and moved to dismiss the disciplinary portion of her grievance as moot, which the Grievance Board granted.  AR 1856–68.

Still, Beberman argues that her request for a hearing is not moot because, although the suspension was rescinded and she is no longer employed in the Foreign Service, the Department had not purged references to these VLA violations from her employee file.  ECF No. 21-1 at 35–37.  So she reasons that she is entitled to a hearing on whether she committed them in the first place.  *Id.*  To make her case, Beberman relies on precedent establishing that because "[t]he Board's jurisdiction is determined by the nature of an agency's action against a particular appellant at the time an appeal is filed with the Board," then "an agency's unilateral modification of its adverse action after an appeal has been filed cannot divest the Board of jurisdiction unless the appellant consents to such divestiture or unless the agency completely rescinds the action being appealed."  *Harris v. Dep't of the Air Force*, 96 M.S.P.R. 193, 195 (2004) (citing *Himmel v. DOJ*,

---

interpretation retroactively.  ECF No. 21-1 at 41–44.  That argument fails for the same reasons.  Because the July 2012 cable does not mean what Beberman says it does, the Grievance Board did not err by concluding that its interpretation "reflect[s] the clear language of a statute in effect since 1996."  AR 4736.

6 M.S.P.R. 484, 486 (1981)).[19] And "[f]or the appeal to be deemed moot, . . . the agency's rescission of the appealed action must be complete." *Id.* Beberman contends that the rescission of her suspension was incomplete, however, because "the Department had not provided [her] with all of the relief to which [she] would have been entitled if [she] had prevailed in the appeal," which included "purging the file of references to the charges and alleged misconduct at issue in the grievance." ECF No. 21-1 at 36 (internal quotation marks and citation omitted) (relying on FSGB Case No. 2008-043, 2010 FSGB LEXIS 135, at *1 (Feb. 19, 2010)).

Nothing about Beberman's argument changes the conclusion that because no disciplinary action was at stake, she was not entitled to a hearing. True, the Grievance Board first held that it lacked jurisdiction to determine the validity of the VLA violations referenced in Beberman's file. AR 1863–64. It reasoned that "[t]he Board had jurisdiction over the discipline that arose from the VLA violation determination; however, once the discipline was rescinded, there was nothing left for the Board to adjudicate concerning the VLA violations." AR 1864. Beberman could—and did—challenge that decision. A few months later, the Board reversed course, holding that it had jurisdiction to assess the validity of the VLA violations referenced in Beberman's file; "[a] more careful review of" her November 2012 evaluation showed "that there are several statements . . . that [Beberman] had in fact committed VLA violations," so she was "entitled to challenge the accuracy of these statements and whether they are falsely prejudicial." AR 3918. And she did so in her appeal. But Beberman does not explain why the Board's continuing jurisdiction over the dispute relating to her evaluations entitles her to a hearing under 22 U.S.C. § 4136(1)(A) when no disciplinary action was at stake. As the Board reasoned, "because there is no longer a discipline

---

[19] *Harris* is a Merit Systems Protection Board case underpinning the Grievance Board precedent that Beberman relies on. *See* FSGB Case No. 2008-043, 2010 FSGB LEXIS 135, at *1 (Feb. 19, 2010).

action to be decided," whether to hold a "hearing is now a matter of Board discretion."  AR 1865; *see* 22 U.S.C. § 4136(1)(B).  The Board then found that it could decide Beberman's appeal on the papers, and she suggests no reason to question the exercise of that discretion.[20]

### D.    Beberman Was Not Entitled to Interim Relief

Beberman also challenges the Grievance Board's denial of interim relief.  She argues that there was "more than a remote possibility" that she would succeed on the merits, and that "[a]lthough her grievances have been decided, the Court can still award her backpay and attorney fees."  ECF No. 21-1 at 90–91.  But the D.C. Circuit has already held that "[i]nterim relief is a stop-gap measure that preserves the status quo while the Board considers a grievance," so it "has no place where, as here, the Board has reached a final decision."  *Beberman v. Blinken*, 61 F.4th 978, 981 (D.C. Cir. 2023).  Plus, "backpay is not an available remedy on judicial review of the Board's orders."  *Id.* at 982; *see also Hubbard v. Adm'r, EPA*, 982 F.2d 531, 538–39 (D.C. Cir. 1992) (en banc) (backpay is unavailable as equitable relief under the APA).  Given all that, "this court has no power to issue backpay as a judicial remedy," and "Beberman's claim is completely devoid of merit."  *Beberman*, 61 F.4th at 982 (internal quotation marks and citation omitted).  That is why—as the Court has explained in more detail elsewhere—"Beberman's challenge to the Grievance Board's denial of interim relief is moot" and no basis for relief.  *Beberman v. Blinken*, No. 22-cv-144 (TJK), 2024 WL 551666, at *5–6 (D.D.C. Feb. 12, 2024); *Beberman v. Rubio*, No. 22-cv-144 (TJK), 2025 WL 894262, at *3–4 (D.D.C. Mar. 24, 2025).

---

[20] Beberman also argues that even if she is not entitled to a hearing, the Department should still bear the burden of proof on whether she violated the VLA Law because only it can prove that the applicants to whom she issued the visas were the aliens appearing in the visa lookout system. ECF No. 21-1 at 46.  But as explained above, the Department needed to prove no such thing.

### E.    Beberman Was Not Entitled to Attorneys' Fees

Finally, Beberman challenges the Grievance Board's denial of $82,105 in attorneys' fees for work that three attorneys performed related to this case as well as (1) the initial discipline proposal; (2) the agency-level grievances; and (3) unsuccessful mediations held, she claims, to resolve all her grievances.  ECF No. 21-1 at 91–93.  To recover attorneys' fees, a grievant must show (among other things) that she is the "prevailing party."  5 U.S.C. § 7701(g)(1).  And to make that showing, she must have "succeeded on any significant issue in litigation which achieve[d] some of the benefit" that she "sought in bringing suit."  *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791–92 (1989) (internal quotation marks and citation omitted).

The Grievance Board denied her request for attorneys' fees, reasoning in part that she failed to show that she was the prevailing party.  The Board had granted her partial relief by redacting as unnecessarily repetitive two passages in her November 2012 Employee Evaluation Report noting that her access to consular systems had been revoked, plus a third comment comparing her visa refusal rate to that of other officers.  AR 3907–09.  But the Board did so sua sponte, and after "carefully review[ing] the record of proceedings," it found "no instance wherein grievant claims that the repetition of negative comments renders the [Employee Evaluation Report] unfair and misleading."  AR 5009.  Put differently, the Board rejected her claims "that such comments, and others that chronicle her numerous VLA violations, were inaccurate and falsely prejudicial and the product of discrimination and retaliation by biased supervisors."  *Id.*  Regardless, the Board also found that "[i]n view of the totality of the relief requested in relation to the actual redactions made by the Board, . . . the relief provided was *de minimis*."  AR 5010.

38

This decision was not arbitrary or capricious.[21]  To the contrary, it was well reasoned and adequately explained why an award of attorneys' fees was unwarranted.  Beberman argues that she was the prevailing party because the Board claimed to have transformed the evaluation from unfair and misleading to fair and balanced, which "constitute[d] more than de minimis relief." ECF No. 21-1 at 92.  But the Board did so "[i]ndependent of [her] arguments . . . ."  AR 3907; *see also* AR 3904–15.  And it denied Beberman's challenges to "the most critical references in the November 2012 [Employee Evaluation Report]—that she committed four VLA violations within one rating period and showed poor judgment by failing to appreciate her errors."  AR 5010.  Pivoting, Beberman tries to recast her original claim, highlighting those times she used the word "repeated" as evidence that she raised the claim of unfair repetition.  ECF No. 21-1 at 91–92.  But as the Board reasoned, "the context of these passages does not support her argument."  AR 5009.[22]

Finally, the Court's decision to remand to the Grievance Board on one narrow issue—an issue that the Board did not resolve in the first instance—does not change this analysis.  Of course, Beberman may seek associated attorneys' fees should the Board decide that issue in her favor.

## IV.     Conclusion

For all the above reasons, the Court will grant in part and deny in part the Department's Cross-Motion for Summary Judgment and Beberman's Motion for Summary Judgment, and it will

---

[21] The Grievance Board also found that "the relief [Beberman] received from the Board was not the result of legal services rendered by her attorneys" and that the "amounts claimed" was "disproportionate to the relief the Board ordered."  AR 5011–23.  That part of its decision, too, was well reasoned and sufficiently articulated.

[22] Beberman also contends that had the Grievance Board not already ordered reconstituted tenure boards to reconsider her application in another of her grievances, it may have done so here. ECF No. 21-1 at 92.  But the Board found that this claim was "mere speculation," and because "the redactions did not change the substance of the [Employee Evaluation Report] . . . on balance, [they] are unlikely to have changed the decision of a [tenure board]."  AR 5011.  The Court agrees for the reasons already explained.

deny Beberman's Partial Motion to Strike.  This matter will be remanded to the Department solely to consider whether to permit Beberman to amend her grievance to challenge the November 2012 end date of her rating period, and if so, to address the merits of that claim.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 12, 2025